# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| TANYA KING, Executor of the Estate of Jamar Ridley, decedent<br>1130 Brooke Park Drive<br>Toledo, Ohio 43612<br><br>      Plaintiff,<br><br>vs<br><br><br>THORATEC LLC<br>*Serve:* CT Corporation System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219<br><br>and<br><br>ABBOTT LABORATORIES,<br>*Serve:* CT Corporation System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219<br><br>      Defendants. | Case No.:<br><br><br>JUDGE<br><br><br><br>**COMPLAINT WITH JURY DEMAND ENDORSED HEREON**<br><br><br><br>Zachary J. Murry (0087421)<br>BARKAN & ROBON LTD.<br>1701 Woodlands Drive, Suite 100<br>Maumee, Ohio 43537<br>Phone: (419) 897-6500<br>Fax: (419) 897-6200<br>Zmurry@barkan-robon.com<br><br>*Attorneys for Plaintiff* |

Now comes the Plaintiff, Tanya King, Personal Representative and Executor of the Estate of Jamar Ridley ("Plaintiff"), by and through undersigned counsel, and for her Complaint against the Defendants, states and avers as follows:

## INTRODUCTION

1. Plaintiff Tanya King was appointed Executor of the Estate of Jamar Ridley, Deceased, by the Lucas County, Ohio Probate Court on June April 21, 2025 (copy of Letters of Authority for Appointing Fiduciary attached hereto as "Exhibit A"). Plaintiff Tanya brings this action as the personal representative of the Estate of Jamar Ridley, Deceased, for the exclusive benefit of the next of kin of the Decedent.

## THE PARTIES

2. Decedent Jamar Ridley was a citizen and resident of the State of Ohio. He was implanted with the Subject HeartMate 3 Device in Cleveland, Ohio and died in Toledo, Ohio.

3. Tanya Ridley is a citizen and resident of the State of Ohio, and was appointed by the Lucas County Probate Court, State of Ohio, on April 21, 2025, as Executor of the Estate of decedent Jamar Ridley.

4. Defendant Thoratec LLC (herein after referred to as "Thoratec") is a limited liability company with its principal place of business at 6035 Stoneridge Drive, Pleasanton, California. Thoratec develops, manufactures and markets proprietary medical devices used for mechanical circulatory support, including the HeartMate 3 left ventricular assist device (herein after referred to as "HeartMate") used to treat heart failure. Thoratec is a subsidiary of defendant Abbott Laboratories, Inc. (herein after referred to as "Abbott").

5. Defendant Abbott is a Delaware corporation with its principal place of business located in Illinois. Abbott is the parent corporation of defendant Thoratec. Upon information and belief, Abott is a supplier of Thoratec.

6. Thoratec and Abbott do business in the State of Ohio, have registered offices and registered agents in the State of Ohio and, at all times relevant to this complaint, distributed and sold the HeartMate 3 in Ohio and in interstate commerce.

## JURISDICTION AND VENUE

7. Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

8. This Court has original jurisdiction over this action pursuant to 28 USC §1332, as the Plaintiffs and Defendants are completely diverse, and the amount in controversy exceeds the sum of $75,000.00.

9. Venue is appropriate in the U.S. District Court for the Northern District of Ohio, pursuant to 28 USC §1391 as a substantial part of the events.

### Facts About the HeartMate 3

10. Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

11. The HeartMate 3 was designed to augment the function of a failing heart as an orthosis without replacing the heart itself. The HeartMate 3 is a continuous flow centrifugal pump with a magnetically levitated rotor. The spinning rotor draws blood from the left ventricle through the inflow cannula and into the pumping chamber along the rotor's axis and propels it tangentially through an outflow graft aligned perpendicular to the inflow cannula. The pump operates continuously in an artificial pulse mode designed to mimic the biological pulsatile flow through rapid changes in pump speed.

12. The following image depicts components of the HeartMate 3:


13. The HeartMate 3 is implanted through a usual sternotomy approach with standard cardiopulmonary bypass techniques. An apical cuff serves as a securing interface between the patient's heart and the HeartMate 3 device, and is sewn to the epicardium near the apex of the left ventricle.



14. Using a circular knife, surgeons either core an opening into the left ventricle before placement of the apical cuff (core then sew) or place the cuff and then core an opening into the myocardium (sew then cut).

15. The inflow cannula of the pump is then inserted into the apical cuff and secured in place by engaging a locking system unique to the HeartMate 3.



16.     This unique locking system (the "slide-lock mechanism") is a mechanical feature that affixes the pump to the apical cuff using two symmetrical locking arms or clasps which surround the inflow cannula and secure it to the heart by engaging a metal ring on the apical cuff, thereby creating a tight seal between the inflow cannula and apical cuff.

17.     The slide-lock mechanism is retracted prior to inserting the inflow cannula into the apical cuff, which allows the pump to be rotated so the outflow graft is directed toward the right ventricle and the driveline toward the midline. Once the pump position is satisfactory, the slide-lock mechanism (in purple below) is pushed inward to engage the locking arms surrounding the inflow cannula.



18.     The outflow graft is then anastomosed end-to-side to the ascending aorta, and the pump is positioned near the apex of the left ventricle. The pump power cable (driveline) is tunneled through the abdominal wall to a selected skin site that is opened with a circular knife of the same

diameter as the cable. Once externalized, the power cable is attached to a modular cable that is connected to the system controller.

19. The pump is de-aired through the outflow graft, cardiopulmonary bypass flow is decreased, and the pump is turned on at a low speed. Once de-airing is complete, pump speed is increased, the patient is weaned from cardiopulmonary bypass, and further adjustments to pump speed are made based upon echocardiography and hemodynamic measurements. The outflow graft is then covered by native pericardium, thoracostomy tubes are placed, and the sternum is closed.

## Federal Regulation of the HeartMate 3

20. The HeartMate 3 was classified by the United States Food and Drug Administration ("FDA") as a Class III medical device. Class III medical devices are devices that are "purported or represented to be for a use in supporting or sustaining human life" or which "present[] a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C)(ii).

21. Class III medical devices like the HeartMate 3 are subject to the FDA's premarket approval ("PMA") process and federal regulation. The purpose of this PMA process and federal regulation is to ensure the safety and effectiveness of medical devices that can cause serious injury or death to consumers if not manufactured properly and distributed to hospitals in the condition approved by the FDA.

22. A PMA application must be submitted to the FDA for any Class III medical device, and is required to contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue.

23. Once a PMA application is approved by the FDA, the applicant may not make any changes that will affect the safety or efficacy of the device without FDA approval, including changes to the previously-approved design specifications.

24. Defendants filed a PMA application for the HeartMate 3 on December 8, 2016 and filed amendments to its PMA application on January 10, February 21, May 22, and August 18, 2017.

25. Pursuant to 21 C.F.R. §814.20, Defendants' PMA application for the HeartMate 3 included, among other information, production specifications used in the manufacture and assembly of the device, a summary of nonclinical laboratory studies used to verify that the design input requirements were met, and a summary of the clinical investigations involving human subjects to establish a reasonable assurance of safety and effectiveness of the HeartMate 3.

26. On August 23, 2017, the FDA granted premarket approval (P160054) for the HeartMate 3 under the Food, Drug, and Cosmetic Act, the effect of which allowed Defendants to begin manufacturing the HeartMate 3 for commercial sale and distribution. The device was indicated for providing short-term hemodynamic support (e.g. bridge to transplant or bridge to myocardial recovery) in patients with advanced refractory left ventricular heart failure.

27. On October 18, 2018, the FDA approved a PMA supplement (S008) which expanded the HeartMate 3's indication to include long-term mechanical circulatory support (i.e. destination therapy) in patients with advanced refractory left ventricular heart failure.

28. By receiving premarket approval for the HeartMate 3, Defendants were required by federal law to manufacture and distribute the HeartMate 3 pursuant to the design specifications approved by the FDA during the PMA process. These design specifications listed in Defendants Summary of Safety and Effectiveness Data include, but are not limited to, the following:

    a. Manufacturing the HeartMate 3 so that the outflow graft is kink resistant;

   b. Manufacturing the HeartMate 3 so that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable;

29. A true copy of the Summary of Safety and Effectiveness Data is attached and here in referenced as Exhibit B.

30. On February 19, 2024, Defendants recalled the HeartMate 3 due to an issue called Extrinsic Outflow Graft Obstruction, (hereinafter referred to as EOGO).

31. EOGO occurs when "biological material builds up between the HeartMate Outflow Graft and the Outflow Graft Bend relief or additional components added during surgery. This buildup can obstruct the device, making it less effective in helping the heart pump blood. It can trigger alarms indicating low blood flow and affect the device's ability to help the heart properly."

32. The Defendants sent a letter on February 19,2025 to all affected customers advising customers to pay attention to low flow as this is the first symptom of significant outflow obstruction.

33. The FDA identified this as a Class I recall, the most serious type of recall. The FDA identified that the use of these devices may cause serious injuries or death.

### Jamar Ridley's Experience with the HeartMate 3.

34. Jamar Ridley battled with nonischemic dilated cardiomyopathy since the age of seventeen.

35. On January 1, 2022, Ridley became severely ill and was transported to a local hospital.

36. Ridley's condition worsened and he was then transferred to the Cleveland Clinic where he was stabilized and an LVAD HeartMate 3 was implanted on January 26, 2022.

37. The serial number of the LVAD that was implanted into Ridley was MLP-030364.

38. Ridley was stable and recovered well without exhibiting any significant symptoms.

39. Ridley followed all required and recommended protocols after the HeartMate 3 was implanted as to have a successful recovery.

40. During this time period, Ridley remained on the transplant list and was awaiting a cardiac transplant.

41. Ridley relied on the reported "life saving features" of the HeartMate 3 while waiting for a heart transplant.

42. Ridleys medicals chart from April 21, 2023, showed him to be stable but having an ejection fraction of 10 to 15%.

43. On August 14, 2023, Ridley displayed no signs of illness or pain to his family.

44. On August 15, 2023, Ridley suddenly became tired, experienced nausea and vomiting, cold sweats, and then suddenly became unresponsive.

45. As a result of this sudden and serve episode, Ridley's family called emergency medical services.

46. The EMS arrived and while being transported, Ridley's HeartMate 3 alerted to low blood flow and Ridley went into full cardiac arrest.

47. Ridley was transported to Toledo Hospital ProMedica where CPR was performed for over an hour until Ridley was pronounced as deceased.

48. On February 19, 2024, the LVAD that was implanted into Ridley with the serial number MLP-030364 was recalled due to EOGO.

## CLAIMS FOR RELIEF

### COUNT I
### (Negligence)

49. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

50. Defendants were responsible for manufacturing, assembling, testing, inspecting, distributing, and selling the Subject HeartMate 3 Device.

51. Defendants had a duty to properly manufacture, assemble, inspect, and distribute the Subject HeartMate 3 Device so that it was not in a defective condition.

52. Defendants had a duty to manufacture, assemble, inspect and distribute the Subject HeartMate 3 Device in compliance with the requirements and specifications set-forth by the FDA in its PMA approval.

53. Defendants had a duty to manufacture, assemble, inspect and distribute the Subject HeartMate 3 Device so that it complied with the FDA's design specifications and regulations governing the device.

54. Defendants had a duty to adequately inspect the Subject HeartMate 3 Device before placing it into the stream of commerce to ensure that the Subject HeartMate 3 Device complied with its FDA-approved design specifications.

55. Defendants breached each of the above-described duties.

56. As a direct and proximate result of Defendants' breaches of the above-described duties, a defective Subject HeartMate 3 Device was introduced and delivered into interstate commerce, and implanted into decedent Ridley, resulting in death.

57. As a direct and proximate result of Mr. Ridley's wrongful death, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise

damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00).

## COUNT II

### (Strict Liability – Manufacturing Defect)

58. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

59. At all times relevant to this Complaint, Defendant was engaged in the business of manufacturing, packaging, selling, and distributing the HeartMate 3 in interstate commerce, and in the State of Ohio.

60. The Subject HeartMate 3 Device did not conform to its FDA-approved design specifications and therefore violated a federal requirement specified in the FDA's PMA approval of the Device.

61. This deviation from the FDA-approved design specifications and federal requirements specified in the PMA approval rendered the Subject HeartMate 3 Device adulterated and defective, and unreasonably dangerous for its intended use.

62. The above-described defect existed in the Subject HeartMate 3 Device when the Device left the Defendants' control.

63. Jamar Ridley could not have anticipated the danger this defect in the Subject HeartMate 3 Device created for him.

64. The Subject HeartMate 3 Device was expected to and did reach decedent Ridley without substantial change in its condition as manufactured, assembled, and sold by the Defendants.

65. As a direct and proximate result of a defect in the outflow graft present in the assembled Subject HeartMate 3 Device, decedent Jamar Ridley suffered cardiac arrest and death.

66. As a direct and proximate result of Mr. Ridley's wrongful death, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00)

## COUNT III

### (Defective Manufacturing/Construction, O.R.C. § 2307.74)

67. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

68. At all times relevant to this Complaint, Defendant was engaged in the business of manufacturing, packaging, selling, and distributing the HeartMate 3 in interstate commerce, and in the State of Ohio.

69. The Subject HeartMate 3 Device did not conform to its FDA-approved design specifications so that the so that the outflow graft is kink resistant and that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

70. This deviation from the FDA-approved design specifications and federal requirements specified in the PMA approval rendered the Subject HeartMate 3 Device adulterated and defective, and unreasonably dangerous for its intended use.

71. The above-described defect existed in the Subject HeartMate 3 Device when the Device left the Defendants' control.

12

72. Jamar Ridley could not have anticipated the danger this defect in the Subject HeartMate 3 Device created for him.

73. As a direct and proximate result of a defect in the outflow graft present in the assembled Subject HeartMate 3 Device, decedent Jamar Ridley suffered cardiac arrest and death.

74. As a direct and proximate result of the Defendants' defective manufacturing, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00)

## COUNT IV

### (Defective Design/Formulation, O.R.C. § 2307.75)

75. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

76. At all times relevant to this Complaint, Defendant was engaged in the business of manufacturing, packaging, selling, and distributing the HeartMate 3 in interstate commerce, and in the State of Ohio.

77. The Subject HeartMate 3 Device did not conform to its FDA-approved design specifications so that that the outflow graft is kink resistant and that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

78. This deviation from the FDA-approved design specifications and federal requirements specified in the PMA approval rendered the Subject HeartMate 3 Device adulterated and defective, and unreasonably dangerous for its intended use.

79. The above-described defect existed in the Subject HeartMate 3 Device when the Device left the Defendants' control.

80. As a direct and proximate result of the defective design of Defendnats product, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00).

## COUNT V

**(Defective Warning/Instruction, O.R.C. § 2307.76)**

81. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

82. Defendants knew or in the exercise of reasonable care, should have known about the risk of EOGO.

83. Defendant failed to provide warning or instruction that a manufacturer exercising reasonable care would have provided concerning EOGO.

84. As a direct and proximate result of the defective warning of Defendnats, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00).

## COUNT VI

**(Defective Due to Nonconformity with Representation, O.R.C. § 2307.77)**

85. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

86. Defendants represented in their Summary of Safety and Effectiveness Data that the outflow graft is able to articulate without kinking.

87. Defendants represented in their Summary of Safety and Effectiveness Data that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

88. The Subject HeartMate 3 Device did not conform to its representations so that the outflow graft is kink resistant and that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

89. The above-described defect existed in the Subject HeartMate 3 Device when the Device left the Defendants' control.

90. Ridley justifiably relied on the representation that the HeartMate 3 would perform how the Defendants represented.

91. As a direct and proximate result of the Ridley's justifiable reliance, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00).

## COUNT VII

**(Defective Due to Nonconformity with Representation, O.R.C. § 2307.78)**

92. Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein, and further states and alleges as follows.

93. Defendants represented in their Summary of Safety and Effectiveness Data that the outflow graft is able to articulate without kinking.

94. Defendants represented in their Summary of Safety and Effectiveness Data that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

95. The Subject HeartMate 3 Device did not conform to its representations so that that the outflow graft is kink resistant and that the installation and removal force of the outflow graft bend relief and the pull-off force of the bend relief to the bend relief clip is acceptable.

96. The above-described defect existed in the Subject HeartMate 3 Device when the Device left the Defendants' control.

97. As a direct and proximate result of the Defendants non-conformity, decedent's heirs have incurred expenses for the last illness and funeral expenses of the decedent and were otherwise damaged in a reasonable amount in excess of Seventy Five Thousand and no/100 Dollars ($75,000.00).

IN WITNESS WHEREOF, Plaintiff prays for the following relief against the Defendants, jointly and severally:

A. For an award of damages, in an amount to be proven at trial, in excess of $75,000.00;

B. For an award of punitive damages, in an amount to be proven at trial, in excess of $75,000.00; and

C. For attorney fees and costs, and such other relief which shall be just and proper in this matter.

Dated: August 14, 2025

Respectfully Submitted
BARKAN & ROBON LTD.

By: /s/ Zachary J. Murry
Zachary J. Murry
*Attorney for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

                                                            By:  /s/ Zachary J. Murry
                                                                   Zachary J. Murry
                                                         *Attorney for Plaintiff*